In the Matter of the Application of INTERNATIONAL ASSOCIATION OF MACHINISTS, Petitioner, for an Order of Compliance to Arbitrate Wage Provisions in an Agreement between Said Union and E. C. STEARNS & COMPANY, Syracuse, New York, Respondent.

Supreme Court, Onondaga County, July 2, 1942.

*Walter Soule* [*A. Lee Olmsted* of counsel], for the petitioner.

*Melvin & Melvin* [*Eugene Lichtenberg* of counsel], for the respondent.

CROSS, J. The question to be decided is whether, under the circumstances, the petitioner is entitled to an order compelling the company to submit to arbitration by the New York State Board of Mediation, a labor dispute involving an increase in wages.

The material facts are not in dispute. The company to the extent of about ninety per cent of its production is engaged in the manufacture of materials for the Army and Navy of the United States. A portion of its work is carried on by direct contract with the United States Government and its products move in the channels of interstate commerce. Its employees went on strike in April last for a twenty per cent increase in wages and new terms as to hours, vacations, holidays, etc. Mediators from the appropriate Federal and State departments responded with proffered assistance upon the call of the union, which was formed after the strike was called. At the suggestion of the union the Federal mediator did not remain. Differences that could not be composed remain unsettled and an agreement for future arbitration by the State Board was signed April 16, 1942. By the terms of the agreement negotiations were to continue and certain questions, if unsettled, were to be arbitrated at a future date. These questions remain unsettled. The company refuses to proceed with the arbitration because of what it maintains are excusable and justifiable grounds, including the new National Economic Policy, announced by the President in his message to the Congress April 27, 1942, and since then in actual operation.

In the declaration of policy embodied in section 750 of the Labor Law, enacted in 1937, the Legislature of this State recognized the process of mediation by a government agency in the case of labor disputes and that the people of the State should always be considered, respected and protected although not a direct party to the proceeding. I think this policy is broad enough to include mediation by a Federal as well as a State agency. Under the State law arbitration is provided for by article 84 of the Civil Practice Act. This article was enacted into law in 1937, when our overruling public policy and social structure were based upon a peacetime economy.

Section 1450 of the Civil Practice Act provides that, upon application by an aggrieved party, if there is no substantial issue as to the making of or failure to comply with a contract for arbitration,

an order shall be made directing that the parties proceed to arbitration in accordance with the contract. Section 1448 of the Civil Practice Act provides that such a contract shall be valid, enforcible and irrevocable, save upon such grounds as exist at law or in equity for the revocation of any contract. This poses the question whether the legislative intent was to compel the court to issue a mandatory order requiring the performance of such a contract, irrespective of whether the result at the time the remedy is applied would be inequitable, illegal or invalid as against public policy. I do not think that was the legislative intent.

In *M'Culloch* v. *State of Maryland* (4 Wheat. 316, 405, 406) it was said by Chief Justice MARSHALL: " The nation, on those subjects on which it can act, must necessarily bind its component parts. But this question is not left to mere reason: the people have, in express terms, decided it by saying, ' this constitution, and the laws of the United States, which shall be made in pursuance thereof,' ' shall be the supreme law of the land,' and by requiring that the members of the State Legislatures, and the officers of the executive and judicial departments of the States, shall take the oath of fidelity to it." (See, also, *Erickson* v. *Macy,* 231 N. Y. 86, 91, 92.)

The Congress, pursuant to the authority vested in it under article I of the Constitution of the United States, by joint resolutions approved December 8, 1941, and December 11, 1941, respectively (Public Laws Nos. 328, 331, 332, 77th Congress), formally declared the state of war existing between the United States and the Imperial Government of Japan and the Governments of Germany and Italy. The joint resolutions authorized and directed the President — who by virtue of his office is Commander-in-Chief of the Army and Navy — to employ the entire naval and military forces of the United States and the resources of the government to carry on the war, and the Congress further pledged all of the resources of the country to bring the conflict to a successful termination. Thereupon a new and overruling public policy came into existence based upon a wartime economy. That public policy has been ever since consistently developed and implemented by the Federal and State Governments toward the legitimate end of bringing the war to a successful termination.

The New York State War Emergency Laws of 1941 and 1942, published pursuant to chapter 573 of the Laws of 1942, prove the trend of legislation and the public policy of this State as one to enable its material resources, including its industrial front, to function efficiently in accordance with the acts of Congress and the directive provisions of duly constituted Federal agencies in furtherance of the national defense.

" In a juridical sense, public policy does not mean simply sound policy, or good policy; but * * * it means the policy of a State established for the public weal ' either by law, by courts or general consent.' " (*Hollis* v. *Drew Theological Seminary*, 95 N. Y. 166, 172.)

When the Supreme Court of this State is called upon to construe and enforce a State statute based upon a peacetime economy — at a time when our nation is at war and in relation to a subject which vitally affects the national defense — it is clear to me that realism requires such construction as permits the most efficient co-operation with the Federal agencies directly charged with the duty of carrying on the war. In this view the present proceeding and the pertinent sections of article 84 of the Civil Practice Act of this State are examined.

The economic policy of the nation in the employment of the military and naval forces of the United States and the resources of the government to carry on the war must inevitably differ radically from an economic policy that is adequate and desirable under our concept of democracy in time of peace. In time of war the construction of peacetime statutes, contractual relations and individual liberties must be subjected to such changes and modifications as are the natural offspring of national emergency and necessity. Inherent in the power to create are the elements to destroy. Congress has the power to declare war, and that carries with it as an incident the power to put into effect such procedures as are reasonably adapted to achieve victory.

Among the means reasonably adapted to that end were the creation by the Congress and by the President, under its authority, of many administrative agencies and the abolition, transfer and reallocation of the work of existing agencies. It is unreasonable to suppose, when we consider the pressure under which the Congress and the President are working, that we must look to a specific act of Congress or Executive Order of the President for definite authority in order to command compliance with orders, rules and policies within the scope and purpose and stemming from the joint resolutions of the Congress in the declaration of war adopted pursuant to the Constitution.

On April 27, 1942 — eleven days after the execution of the contract for arbitration herein and before the time fixed therefor — the President, in a formal message to the Congress, announced a new " National Economic Policy " as an inextricable component of the National War Policy and to further implement and effectuate the employment of the resources of the government to carry on the war. This message in its content integrated many inter-

dependent matters into the overall composite policy of successful prosecution of the war. The presidential pronouncement contained the following language pertinent to the pivotal point in this proceeding: " Organized labor has voluntarily given up its right to strike during the war. Therefore all stabilization or adjustment of wages will be settled by the War Labor Board machinery which has been generally accepted by industry and labor for the settlement of all disputes."

The War Labor Board was created by Executive Order No. 9017 of the President, dated January 12, 1942, and its preamble is predicated on the joint resolutions of the Congress declaring war. This Board, as appears by the preamble, was established for the peaceful adjustment of labor disputes. It seems to me, upon the undisputed facts and the applicable law, that the instant labor dispute has reached such a stage that the procedures provided by section 3 of the Executive Order, even if applicable to the New York State Mediation Board, have already been exhausted and that further State action would be mere vexation and futility. For the reason, among others,'that in any event the Commissioners of Conciliation of the Department of Labor may voluntarily intervene in the dispute and the War Labor Board in its discretion, after consultation with the Secretary of Labor, may take jurisdiction of the dispute on its own motion. Taking into consideration the solemn recommendation of the President to the Congress announcing the new National Economic Policy in connection with the Emergency Price Control Act (Public Law No. 421, approved January 30, 1942) and the nature, number and speed of wartime orders, regulations, amendments and interpretations arising out of the wartime acts of Congress and the war emergency laws of the State of New York, it is clear that the legal, equitable and realistic method of settlement of the instant dispute, at this stage, is through the medium of the New National War Labor Board.

Time is of the essence if this war is to be won. Implicit in the intent of all these laws and regulations is the co-ordination of the National War Labor Board, War Production Board and all the other agencies established by and under the authority of Congress and the wartime powers of the President; all to the end that the intermediate procedure of State agencies, acting by indirection, be fused into and superseded by national agencies capable of direct action. If we are to retain with jealous tenacity our peacetime conception of the reserved rights of the States and the judicial and administrative machinery by which the special interests of persons dealing in the spirit of the market place will be safeguarded, the war may be lost before our national resources can be made to

function efficiently. Effective national defense is directly dependent upon unified national thought and action.

Upon further consideration of facts of common knowledge, that the rules, orders and regulations of existing Federal agencies are being applied in actual practice by common consent, as illustrated by the "General Maximum Price Regulations" fixing prices generally, including the prices at which the company may sell its products, at levels which are calculated to prevent ruinous inflation and which, in effect, cut across existing contracts, it is patent that any business employing capital and labor in supplying materials to the Army and Navy is dependent for its existence on compliance with the rules and regulations of Federal agencies interpreting the National War Policy.

That the nation is now operating on a war basis is not debatable. The further deduction is inescapable that our National Economic Policy should be made to synchronize with our National War Policy, of which it is a component part. The War Labor Board has plenary power in carrying out that policy to take into consideration the essential interrelationship of military and civil requirements and priorities, government subsidy, maximum prices, profits, taxes, total cost and any and all pertinent factors that bear upon the adjustment and stabilization of wages. A process by which wages are fixed by a State agency and the price of the products of wages by a Federal agency is an administrative anachronism.

It is not necessary, however, for the court to determine that the National Public Policy is sound policy or good policy. (*Hollis* v. *Drew Theological Seminary, supra.*) The court presumes that both parties were in good faith in making the contract for future arbitration and in the position taken upon this application. Neither will the court presume that either party was actuated by a desire to profiteer. "But whether it be or not, it is the government we must think of and its necessity for preservation * * *." (*Mawhinney* v. *Millbrook Woolen Mills*, 231 N. Y. 290, 299.) The merits of the wage dispute are not within the issue here decided.

In this view I think the petitioner cannot prevail in this proceeding.

Upon examination of the settled law of the State of New York, as deduced from judicial decisions in their application to the circumstances here, I am of the opinion that performance of the contract for arbitration is excused. The situation which excuses performance was not created by either of the parties to the contract. It was created by the Government of the United States acting through its duly constituted agencies. (*Mawhinney* v. *Millbrook Woolen Mills, supra.* See, also, *Garcia Sugars Corp.* v. *New York Coffee & Sugar Exchange, Inc.*, 7 N. Y. Supp. [2d] 532; *Adler* v. *Miles.* 69 Misc. 601.)

The highest court of this State said in the case of *Trustees of Columbia College* v. *Thacher* (87 N. Y. 310, 317): " It certainly is not the doctrine of courts of equity, to enforce, by its peculiar mandate, every contract, in all cases, even where specific execution is found to be its legal intention and effect. It gives or withholds such decree according to its discretion, in view of the circumstances of the case, and the plaintiff's prayer for relief is not answered, where, under those circumstances, the relief he seeks would be inequitable. * * * And so though the contract was fair and just when made, the interference of the court should be denied, if subsequent events have made performance by the defendant so onerous, that its enforcement would impose great hardship upon him, and cause little or no benefit to the plaintiff."

I think subsequent events have made performance by the company so onerous that enforcement of the contract for arbitration would impose great hardship upon it and cause no benefit to the petitioner. This is true because the New National Economic Policy, inaugurated April 27, 1942, marked a new application and head to National Public Policy, and this change necessarily tends to thwart the end and efficacy of the executory contract for arbitration as between the parties. But whether this is true or not, the necessity for preservation of the government subjects their private ends to the present National Defense Policy. The recapture of the rights of the people to life, liberty and happiness as they were glorified and guaranteed in time of peace must be deferred to a future day in the interest of self-preservation. The continuance of our form of government is conditioned on the successful termination of the war.

In view of the foregoing reasons, based upon public policy, law and equity, I am constrained to the conclusion that the application of the petitioner must be denied.

Prepare order accordingly.