The People of the State of New York, Plaintiff, *v.* Amecco Chemicals, Inc., Defendant.

City Court of Rochester, Criminal Branch, June 24, 1943.

*Daniel J. O'Mara, District Attorney (John C. Little* of counsel), for plaintiff.

*J. Emmett O'Brien* for defendant.

WILDER, J. The defendant is charged with maintaining a public nuisance in violation of subdivision 1 of section 1530 of the Penal Law, defining the offense as " unlawfully doing an act, or omitting to perform a duty which act or omission: 1. annoys, injures or endangers the comfort, repose, health or safety of any considerable number of persons ".

At the close of a long trial largely involving expert testimony along highly technical scientific lines the court felt, and now wishes to register, admiration of the skill, understanding and thoroughness of the Assistant District Attorney in presenting the People's case and no less of defense counsel's resourceful and exhaustive presentation.

Persons living in the vicinity of the defendant's plant were affected by fumes escaping therefrom in the course of its manufacture of a product for the War Department, the same being highly essential for protection of the armed forces in the field.

The members of a community have the right to live and breathe in an atmosphere uncontaminated by harmful or offensive gases or odors. (*People* v. *Rosenfeld,* 254 N. Y. 245.) Yet those who choose to live in a city cannot expect always to enjoy the pure air of suburban areas. The atmosphere of industrial areas is seldom free from smoke and odors from factories and other sources, and those moving into such a locality must expect to experience some of the annoyances incident to life in the area of their choice. Such inconveniences must be weighed against the common good. (*Bove* v. *Donner-Hanna Coke Corp.,* 236 App. Div. 37.)

To the extent that the common good assumes national proportions, it becomes by just so much a stronger factor; and when that factor involves the power of the Federal government to equip armies, no undue interference with it will be tolerated. (*People ex rel. Astoria Light, Heat & P. Co.* v. *Cantor,* 236 N. Y. 417.) War powers " are not limited by these ordinary rules. They are not bounded by any specific grant of authority. * * * They are such powers as are essential to preserve the very life of the nation itself. When requisite to this end the liberty of the citizen — * * * the peacetime rights of the states must all yield to necessity." (*Public Service Comm.* v. *N. Y. C. R. R. Co.,* 230 N. Y. 149.)

In relation to "a State statute based upon a peacetime economy — at a time when our nation is at war and in relation to a subject which vitally affects the national defense ＊ ＊ ＊ realism requires such construction as permits the most efficient co-operation with the Federal agencies directly charged with the duty of carrying on the war. ＊ ＊ ＊ In time of war, the construction of peacetime statutes, contractual relations and individual liberties must be subjected to such changes and modifications as are the natural offspring of national emergency and necessity." (*Matter of Int. Assn. of Machinists* v. *Stearns & Co.*, 178 Misc. 661.)

In the light of these authoritative pronouncements, the issues in this case must be resolved. This defendant was engaged by the War Department to manufacture chlorinated paraffine to be used for flame proofing and gas proofing tentage and the uniforms of soldiers, sailors and marines. Early in 1941 the War Department made a survey to determine the number of makers of this product. It found but three in the country, and of these only the defendant was available to carry on the work, having been manufacturing the product for some four years. Its president had pioneered in making it for commercial purposes and had worked on it about twenty years.

On demand by the War Department, the defendant built new buildings and procured much additional equipment with the aid of the Department in the matter of priorities. At the time the aim was to raise an army of one million. After Pearl Harbor and the proposed increase of the army to millions, the demands upon the defendant correspondingly increased as did the War Department's constant pressure for more and still more production requiring still more buildings and equipment. The defendant was required to operate twenty-four hours every day of the week.

In this great emergency Colonel Clough of the Chemical Division of the War Department ordered the defendant not to shut down to accomplish the expansion but to "cut in" new units as they were completed. This resulted in the escape of hydrochloric acid and some chlorine gas into the atmosphere. There were other escapes of gas not directly due to the "cutting in" method, but they were all more or less due to conditions that might be expected to arise in the hurried performance of an exacting task in a great emergency. It would be strange if there were not some instances of oversight and misjudgment.

It satisfactorily appears that the equipment installed was the best obtainable and adequate for the purposes; and that

the defendant used every reasonable means to obtain competent help and to train it.

The defendant's plant is in a heavy industrial zone and abuts on the south side of the main line of the New York Central Railroad. North of and a few hundred feet from the railroad there are houses, including the residences of a considerable number of people claiming to have been affected by the fumes. Also north of the tracks but east of the houses are a substation and a gas storage tank of the Rochester Gas & Electric Corporation. Traffic is heavy on the railroad, with resultant smoke and fumes.

It appears that clouds of fumes from the defendant's plant at times drifted across the railroad and reached some of the more southerly of the houses. The smell of fumes was noticeable on those and other occasions. A few of the more southerly shade trees became defoliated. Later as the work of expanding the plant progressed conditions improved and the trees in question grew new leaves.

A considerable stretch of communication wires and copper rail bonds on the railroad became corroded by the fumes and required replacement. Large copper switches and fuses in the substation of the lighting company also were corroded and required cleaning to insure continued service. Evidence as to such property damage was admitted not as a substantive part of the offense (which is confined to " comfort, repose health or safety ") but as bearing upon the degree of concentration of chlorine or hydrochloric acid in the atmosphere.

Residents of the neighborhood testified that the fumes were so strong that they could not sit on their porches in the summer, that they had to close bedroom windows, that the fumes caused coughing, that they were offensive. Rarely if at all were all members of a household affected. For example a wife but not the husband or vice versa, or an adult but not children. In no case was illness caused and no one called a physician. No doubt the fumes were offensive. So the problem here comes down to the relative importance of the emergent war effort and so much of the statute as protects " comfort " and " repose ". No question of " health or safety " is involved.

In the light of the principles set forth in the beginning of this memorandum it would be unreasonable to say that under the conditions here involved the comfort and repose of members of a small community are superior to an emergency undertaking to protect the bodies and lives of men in the armed forces against flame and gas.

As further bearing on the question, see, also, *People* v. *Cuneo Eastern Press* (257 N. Y. 208); *People* v. *Dayton Cleaners & Dyers Corp.* (251 App. Div. 332).

I find the defendant not guilty of the crime charged and dismiss the information.